[Cite as *State v. Petrik*, 2010-Ohio-3671.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
CRAWFORD COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO. 3-10-06

    v.

SHAWN M. PETRIK,                     O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Crawford County Common Pleas Court
Trial Court No. 09-CR-0162

Judgment Affirmed

Date of Decision:   August 9, 2010

APPEARANCES:

    *Shane M. Leuthold*  for Appellant

    *Clifford J. Murphy*  for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Shawn Petrik, appeals from the judgment of the Court of Common Pleas of Crawford County convicting him of one count of robbery and sentencing him to a six-year prison term. On appeal, Petrik argues that his conviction was against the manifest weight of the evidence, and that the trial court erred in sentencing him to a six-year prison term where his accomplice was only given a four-year prison term. Based on the following, we affirm the judgment of the trial court.

{¶2} In October 2009, Petrik was indicted by the Crawford County Grand Jury on one count of robbery in violation of R.C. 2911.02(A)(1)(2), a felony of the second degree. The indictment arose from an incident during which Petrik and his cousin, Timothy Ward, entered a Verizon Wireless store at which Ward's girlfriend was working at the time, forced Ward's girlfriend into a back room at gunpoint, and attempted to break open the store's safe. Subsequently, Petrik entered a not guilty plea to the charge.

{¶3} In December 2009, the case proceeded to a jury trial, at which Michelle Leasure testified that she was sitting in her vehicle across the street from the Verizon Wireless store in Crawford County on September 21, 2009, waiting for her husband to finish shopping inside a flea market; that, as she was waiting, she noticed someone wearing an orange "hoodie" with a backpack on his back

(trial tr., vol. 1, p. 51); that the man was pacing back and forth beside the Verizon store and looking around; that she also observed this individual put on white gloves while outside the store, and then enter the store; that, as she drove away, she noticed a second individual in the same area wearing a dark "hoodie" (id. at p. 52); that the second person was approximately one block from the Verizon store; that she never saw the second person enter the store; and, that she thought all of this activity was suspicious, so she notified the police.

{¶4}   Timothy Ward testified on direct examination that he was Petrik's cousin; that they had lived approximately one block from each other for the past six years; that, on September 21, 2009, he drove his girlfriend, Kelley Nalley, to her place of employment at the Verizon store; that, shortly after dropping off Nalley, he received a call from Petrik, during which Petrick indicated to meet him underneath the bridge in Galion; that, when he arrived at the bridge, Petrik was there and stated that he wanted to rob the Verizon store; that Petrik also showed him a firearm at this time; that he changed into a sweatshirt with a hood, and Petrik also wore a sweatshirt with a hood; that, when they arrived at the Verizon store, he went to the back of the store, and Petrik entered the front of the store and let him in the back door; that Petrik handed him a backpack with a crowbar inside and asked him to get the safe off the wall; that he could hear Nalley inside the room next to him crying and asking them to leave; that, subsequently, the police

arrived at the store and arrested him; that Petrik had already left the store before the police arrived; and, that Petrik sent him a letter while in prison asking him to state that Petrik had no involvement in the robbery. Subsequently, Ward read the letter Petrik wrote to him, and it was admitted as an exhibit.

{¶5} On cross-examination, Ward testified that, on the evening prior to the robbery, he went to Petrik's residence and discussed going hunting the following day; that he was supposed to go hunting with Petrik on the day of the robbery; that he was wearing an orange sweatshirt with a hood on the day of the robbery; that he received a text from Petrik that morning asking what time Nalley went to work and stating that the rifles they were going to hunt with were clean; that he did not discuss a specific plan with Petrik on how they would rob they store, or what they would do after they robbed the store; that he did not receive a text message from Petrik during the robbery indicating the police were at the door; that the white powder residue found in Nalley's vehicle was crushed Percocet tablets that he would snort; and, that he did not have a prescription for the Percocet.

{¶6} Lieutenant Lynn Sterling of the Galion Police Department testified that she was working the day shift on September 21, 2009; that she was dispatched to the Verizon store on a report of suspicious activity outside the store; that she arrived at the store at 10:52 a.m. and approached the front door, while Officer

Burkey went to the back door of the store; that the front door was locked and the lights were turned off; that Officer Burkey called her to the back door, where he had Ward at gunpoint; that only Ward was apprehended that morning at the store, and no other persons were seen participating in the robbery; and, that she did not observe anyone running from the store when she arrived at the scene.

{¶7} Detective Eric Bohach of the Galion Police Department testified that he and Detective Shaffer were dispatched to the Verizon store on September 21, 2009, in response to a robbery in progress involving weapons and two suspects; that, when they arrived at the store, one suspect was in custody; that he discovered a pry bar, a revolver, and a backpack inside of the store; that, based on his observation of the revolver, it was operable; that the safe inside the store had extensive damage to the point where it could not be opened; that cash was also discovered in the store by the firearm and around the backpack; that, after Petrik was arrested in connection with the robbery, he interviewed him; that, during the interview, Petrik indicated that he went to meet Ward in Lexington to go hunting, but Ward never arrived; that it would not make sense for Petrik to hunt because he was not permitted to possess a weapon; that Petrik also told him during the interview that he purchased cigarettes from a Shell station, but when he attempted to verify the transaction at the station, there was no evidence that it occurred; that, on the morning of the robbery, Petrik sent a text message to Ward stating that the

guns were cleaned and asking what time Nalley went to work; that Ward then sent a text message to Petrik stating that he was in Galion; that Petrik then replied to Ward stating, "let me know when leaving. I'll be in alley" (trial tr., vol. 2, p. 127); that Petrik also sent a text message to Ward at 10:51 a.m. stating that the police were at the front door, and that 10:51 a.m. was the approximate time that Lieutenant Sterling first arrived at the store; and, that Petrik sent a text message to either Ward or Nalley approximately thirty to forty-five minutes later asking about Ward's whereabouts.

{¶8} Detective Bohach further testified that Nalley indicated to him that she was placed in a room during the robbery, and that she was not able to open the door; that the door did not have a lock, so someone must have been holding the door; that two people were likely present during the robbery because one person would have had to hold the door and the other person would have attempted to break into the safe; that Nalley stated that she only saw one person in the store during the robbery, and he was wearing an orange sweatshirt; that, when Ward was arrested, he was wearing an orange sweatshirt, and Nalley indicated Ward was the individual involved in the robbery; that he found Nalley's vehicle under the overpass where Ward indicated that he an Petrik met prior to the robbery; and, that Ward was consistent in his story that Petrik was involved in the robbery.

{¶9} Kelley Nalley testified that she was Ward's girlfriend; that she and Ward lived together for the past five or six years; that, on September 21, 2009, Ward drove her to her place of employment at the Verizon store; that Ward and Petrik planned to go hunting that day; that, shortly after she started work, a man walked into the store wearing a mask and white gloves and holding a gun; that the man forced her to lock the door to the store, turn out the lights, and go into a storage room in the rear of the store; that, while she was in the room, she failed in her attempt to open the door, and that it felt as if someone was holding the handle to the door; that, while in the room, she heard "pounding" in the other room where the safe was located (id. at p. 171); that it would not be possible for someone to hold the door and attempt to open the safe because the rooms were too far apart; that she only saw and heard one person in the store during the robbery; that she subsequently was able to open the door and found Ward being arrested; that, while Ward was being arrested, he stated "he's outside" (id. at p. 176); that she did not know if Ward was the person who pointed the gun at her during the robbery; and, that Ward had the key and the "code" to the store. (Id. at p. 187).

{¶10} Subsequently, the State rested, and Petrik moved for a judgment of acquittal pursuant to Crim.R. 29, which the trial court denied.

{¶11} Jamie Griffith then testified on direct examination that Petrik is her children's father; that Petrik picked up his daughter from her house at 7:45 a.m. on

September 21, 2009, to take her to preschool; that, when he picked up his daughter, he stated "he had little things to do for his mom" (id. at p. 197); that she saw him again around 9:00 or 9:10 a.m. at his mother's house; that she saw Petrik leave his mother's house approximately 9:30 or 10:00 a.m. to go to the store; that Petrik drove his mother's car to go to the store; that Petrik returned around 10:30 a.m. and worked on both his and his mother's car; that she then left to pick up her daughters from school and returned at 11:05 a.m. to Petrik's house, and he was at the residence when she arrived; that she helped Petrik's girlfriend make lunch for the children; that Petrik then left the house to buy cigarettes and returned at 11:25 a.m.; and, that Petrik asked her if she heard from Ward because Ward failed to meet him at the hunting location that morning.

{¶12} On cross-examination, Griffith testified that she wrote a statement to Petrik's attorney on September 30, 2009, in regards to Petrik's whereabouts on the date of the robbery; that she said in the statement that she first saw Petrik on the day of the robbery at 9:20 a.m.; that she also indicated in the statement that Petrik left his mother's house approximately 9:45 a.m. to go to the grocery store and Rite Aid; that she did not have actual knowledge he went to those locations, but his girlfriend told her he went to those locations; and, that she also said in her statement that Petrik went to the gas station at 12:00 p.m. and returned home.

{¶13} Amanda Brokaw testified that she was Petrik's girlfriend; that they lived together; that, on the evening before the robbery, Petrik and Ward discussed going hunting the following day, and that she helped Petrik clean the guns; that she sent Ward a text message from Petrik's phone telling him that the guns were ready for the hunting trip; that, on September 21, 2009, Petrik picked up his children at 7:30 a.m. to take them to school; that he arrived home at approximately 8:00 a.m., and then went to the store for his mother; that Petrik went to Foust's Farm at 9:00 a.m. to hunt with Ward; that he returned home around 11:00 a.m., wearing his camouflage, and asked if Ward had called or stopped at the house; that Griffith arrived at the house also around 11:00 a.m. and assisted her in making lunch for the children; and, that, if Petrik would have come home between 9:00 a.m. and 11:00 a.m. to work on the vehicles, she would have known because he would have entered the house first.

{¶14} Petrik testified that he lived with his mother; that, on the day prior to the robbery, he was at home with Brokaw while she was cleaning the guns; that Ward came to the house and they discussed going squirrel hunting the following day on Forest Foust's property; that the plan was for Ward to hunt and for him to scout the property; that he asked Brokaw to send a text message to Ward telling him that the guns were clean; that, on September 21, 2009, he took his children to school that morning and returned home at 8:00 a.m.; that he sent Ward a text

message that morning asking what time Nalley went to work so he would know what time to meet Ward to go hunting; that the only text message he received back from Ward stated that Ward was in Galion; that Ward subsequently called him and told him that he would be twenty to twenty-five minutes late; that he went to Foust's Farm at approximately 9:45 a.m. and waited for Ward, but he never came; that he did not text Ward while waiting for him because he left his phone at home; that he returned home at approximately 10:15 a.m., retrieved his phone from the garage, and proceeded to drive around looking for Ward; that he drove past Ward's house, but did not see him, so he proceeded to the Verizon store; that, as he approached the store, he saw police in the parking lot, so he sent Nalley a text message stating, "trouble, cops at your door" (id. at p. 232); that he later discovered the text was accidently sent to Ward; that he was not aware that Ward was inside the store at that time; that he then "circled the block," and saw police cars behind the building, but did not see Ward's vehicle; (id. at p. 235); that he assumed Ward was not there, so he proceeded to drive home; that, when he arrived home, he sent a text message to Nalley asking her where Ward was and stating that he was upset because Ward failed to meet him for hunting; that he also sent Ward a text message complaining that he did not meet him; that he subsequently went to the Shell station to purchase cigarettes; that he was, in no way, aware of or involved with Ward's robbery of the Verizon store; that his phone has a feature

that automatically deletes text messages; and, that he needs to periodically delete the text messages because his phone will not receive new messages if his inbox is full.

{¶15} On cross examination, Petrik testified that he never attempted to call either Nalley or Ward when he saw the police at the Verizon store, despite the fact that Ward is a family member and Nalley is important to Ward; that he did not call the police to see if everything was okay because it was none of his business; that he drove his van when he went to Fousts' Farm; that Griffith was mistaken when she testified that he left in his mother's car around 9:45 a.m., and she was also incorrect when she testified that he returned at 10:15 a.m. from the store; that he wrote a letter to Ward stating, "if you do talk, I'm F'ed" (id. at p. 260); and, that what he was referring to in the letter was if Ward falsely stated he was involved in the robbery.

{¶16} Subsequently, the jury convicted Petrik on the one count of robbery in violation of R.C. 2911.02(A)(1)(2).

{¶17} In February 2010, the trial court sentenced Petrik to a six-year prison term, imposed a $250 fine, and ordered him to pay $115 in restitution to the Verizon store.

{¶18} It is from his conviction and sentence that Petrik appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE CONVICTION OF APPELLANT, SHAWN PETRIK, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. II*

**THE COURT ERRED BY SENTENCING THE APPELLANT TO A PRISON TERM OF SIX YEARS WHEN THE CO-DEFENDANT TIM WARD WAS ONLY GIVEN A BASIC PRISON TERM OF FOUR YEARS.**

*Assignment of Error No. I*

{¶19} In his first assignment of error, Petrik argues that his conviction was against the manifest weight of the evidence. Specifically, Petrik contends that his conviction should be reversed because Ward was the only person who testified that he was present during the robbery, the victim only saw and heard one person robbing the store, and the police never found evidence demonstrating he was present during the robbery. We disagree.

{¶20} When an appellate court analyzes a conviction under the manifest weight standard, it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, superseded by constitutional amendment on other grounds as

stated by *State v. Smith,* 80 Ohio St.3d 89, 1997-Ohio-335, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.

{¶21} In the case sub judice, testimony was presented by multiple witnesses that either directly or indirectly implicated Petrik's involvement in the robbery. Ward testified that Petrik assisted him in the robbery; that Petrik went in the front door of the Verizon store and let him in the back door; that Pertrik provided a gun to be used in the robbery, and a crowbar to pry open the safe; that Petrik was able to leave the store before the police arrived; and, that Petrik sent him a letter while in prison asking that he not disclose Petrik's involvement in the robbery. Ward's testimony of Petrik's involvement is further supported by Leasure's testimony that she saw two individuals wearing hooded sweatshirts outside of the store, and Nalley's testimony that, although she did not see two people during the robbery, it seemed as if one person was holding the door so she could not get out of the storage room, while another person tried to open the safe, and that Ward told police that "he's outside" when he was arrested. (Trial Tr., Vol. 2, p. 176). Furthermore, Detective Bohach testified that two people were likely present during the robbery because one person would have had to hold the door to keep Nalley in the storage closet, while the other person attempted to open

the safe; that Ward maintained a consistent story regarding Petrik's role in the robbery; that he found Ward's vehicle under the overpass where Ward indicated that he and Petrik met prior to the robbery; and, that Petrik sent a text message to Ward on the morning of the robbery stating "let me know when leaving. I'll be in alley," and another text message at 10:51 a.m., approximately the same time Lieutenant Sterling arrived at the store, stating there was trouble because the police were present. (Trial tr., Vol. 2, p. 127).

{¶22} Although Petrik did testify that he was not involved in the robbery; that he went to meet Ward for a hunting trip and ran errands for his mother around the time of the robbery; that he sent the text message about the police being at the door to the store because he drove by the store looking for Ward and saw the police out in front of the building; and, that he sent the letter to Ward asking Ward not to implicate him in the robbery because he did not want Ward to lie about his involvement, it is also clear from the record that the testimony presented by Petrik and his witnesses was inconsistent.

{¶23} Griffith testified that she saw Petrik at his mother's house at approximately 9:00 a.m.; that Petrik left in his mother's car around 9:30 or 10:00 a.m. to go to the store; that he returned around 10:30 a.m.; and, that he was also home when she returned at 11:05 a.m. However, Brokaw testified that Petrik left to go hunting around 9:00 a.m. and did not return until approximately 11:00 a.m.,

and that if he would have returned between then, she would have known. Moreover, Petrik testified that he left to meet Ward at the hunting location around 9:45 a.m. and returned home at 10:15 a.m., and that he left in his van and not his mother's car.

{¶24} Consequently, because we find that testimony from multiple witnesses evidenced Petrik's involvement in the robbery; that the testimony presented by Petrik, Griffith, and Brokaw as to Petrik's whereabouts on the morning of the robbery was inconsistent; and, that the trial court likely found Petrik's self-serving testimony to be unreliable, as it was in the best position to weigh witness credibility, see *State v. Hundley*, 3d Dist. Nos. 15-09-10, 15-09-12, 2009-Ohio-6873, ¶19, we find that his conviction was not against the manifest weight of the evidence.

{¶25} Accordingly, we overrule Petrik's first assignment of error.

*Assignment of Error No. II*

{¶26} In his second assignment of error, Petrik argues that the trial court erred in sentencing him to a six-year prison term where his accomplice was only given a four-year prison term. Specifically, he contends that the evidence demonstrated that Ward was the more culpable party in the robbery and that he was punished for exercising his constitutional right to a jury trial instead of accepting a plea deal like Ward. We disagree.

{¶27} An appellate court must conduct a meaningful review of the sentencing decision of the trial court, *State v. Daughenbaugh,* 3d Dist. No. 16-07-07, 2007-Ohio-5774, ¶8, citing *State v. Carter,* 11th Dist. No.2003-P-0007, 2004-Ohio-1181, meaning that the appellate court may modify or vacate a felony sentence on appeal, and remand to the trial court for resentencing, if it is clearly and convincingly found that the record does not support the sentence or that the sentence is contrary to law.[1] *State v. Brownridge*, 3d Dist. No. 9-09-24, 2010-Ohio-104, ¶31, citing *Daughenbaugh*, 2007-Ohio-5774, at ¶8; R.C. 2953.08(G).

{¶28} In *State v. Foster,* 109 Ohio St.3d 1, 2006-Ohio-856, the Supreme Court of Ohio severed portions of Ohio's felony sentencing law after finding them unconstitutional.  The Court held that "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences."  Id. at paragraph seven of the syllabus.  Further, the Court stated that "[o]ur remedy does not rewrite the statute, but leaves courts with full discretion to impose a prison term within the basic ranges of R.C. 2929.14(A) * * *."  Id. at ¶102.  Additionally, the Court held that "[c]ourts shall consider those

---

[1] We note that the Supreme Court of Ohio's plurality opinion in *State v. Kalish,* 120 Ohio St.3d 23, 2008-Ohio-4912, established a two-part test utilizing an abuse of discretion standard for appellate review of felony sentencing decisions under R.C. 2953.08(G).  While we cite to this Court's precedential clear and convincing review standard adopted by three dissenting Justices in *Kalish,* we note that our decision in this case would be identical under the *Kalish* plurality's two-part test.

portions of the sentencing code that are unaffected by today's decision and impose any sentence within the appropriate felony range." Id. at ¶105.

{¶29} Trial courts are still required to comply with R.C. 2929.11, 2929.12, 2929.13, and the unsevered portions of R.C. 2929.14. *Foster,* 109 Ohio St.3d 1, at ¶36. However, R.C. 2929.11 and 2929.12 do not mandate judicial fact-finding; rather, in exercising its discretion, a trial court is merely required to "consider" the purposes of sentencing in R.C. 2929.11 and the statutory guidelines and factors set forth in R.C. 2929.12. Id. at ¶¶36-42. See, also, *State v. Mathis,* 109 Ohio St.3d 54, 2006-Ohio-855, ¶38; *State v. Roehl,* 3d Dist. No. 4-07-10, 2008-Ohio-85, ¶10; *State v. Estep,* 3d Dist. No. 9-07-16, 2007-Ohio-6713, ¶12.

{¶30} An increased prison term based upon a defendant's decision to exercise his right to a jury trial and require the State to meet its burden of proof, instead of accepting the State's offer to plead guilty, is wholly improper. *State v. Morris*, 159 Ohio App.3d 775, 2005-Ohio-962, ¶12, citing *State v. Scalf* (1998), 126 Ohio App.3d 614, 621. "[A] defendant is guaranteed the right to a trial and should never be punished for exercising that right or for refusing to enter a plea agreement * * *." *State v. O'Dell* (1989), 45 Ohio St.3d 140, paragraph two of the syllabus. "Once it appears in the record that the court has taken a hand in plea bargaining, that a tentative sentence has been discussed, and that a harsher sentence has followed a breakdown in negotiations, the record must show that no

improper weight was given the failure to plead guilty and must affirmatively show that the court sentenced the defendant solely upon the facts of his case and his personal history, and not as punishment for his refusal to plead guilty." *Columbus v. Bee* (1979), 67 Ohio App.2d 65, paragraph one of the syllabus. See, also, *State v. Dawson,* 2d Dist. No. 21768, 2007-Ohio-5172, ¶19; *State v. Frazier*, 10th Dist. No. 96APA06-774, 1997 WL 253963.

**{¶31}** Here, the trial court sentenced Petrik to a six-year prison term, while his accomplice, Ward, only received a four-year prison term. However, in reviewing the record, we find no error in the trial court's sentence. First, the trial court was not involved in the plea negotiation process, so the analysis as set forth in *Bee* has no applicability to this case, and there need not be an affirmative showing that Petrik's sentence was solely based on the facts of the case and was not the result of a punishment for refusing to plead guilty. Moreover, the trial court sentenced Petrik to a prison term within the permissible range for a felony of the second degree, as provided in R.C. 2929.14(A)(2), and, pursuant to *Foster*, the trial court was authorized to sentence him to any prison term within that range. Finally, the trial court also indicated it considered the principles and purposes of sentencing under R.C. 2929.11 and the seriousness and recidivism factors of R.C. 2929.12. While the trial court may have sentenced Petrik to a longer prison term

than Ward, many valid reasons persist for such a sentence, including Petrik's lengthy criminal history and his lack of remorse for the offense.

**{¶32}** Accordingly, we overrule Petrik's second assignment of error.

**{¶33}** Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/jlr**